Mr. Campbell. May it please the court. The district court's judgment of conviction in this case should be reversed and a judgment of acquittal entered because of the insufficiency of the evidence or in the alternative remanded for a new trial because of the prejudicial evidentiaries that took place. I'll start with the insufficiency of the evidence as to the interstate commerce element of the arson statute 844I. In a criminal prosecution, every element of an offense, even an interstate commerce element, must be proven with individualized proof beyond a reasonable doubt. So let me ask you why that isn't the case. I mean there is a lot of individualized proof here. Nobody's just saying because there was a fire it affected interstate commerce. After Jones, after Russell, you know, one doesn't do that. But there's proof that there are actually three commercial units in this building. Two for residents that have active leases, one that's for rent but empty. So that's that's individualized proof. And under Russell, when you've got to the point of proving that the building is being used in a commercial capacity, you are not anymore in the situation that Jones treated, you know, with private residences with say interstate gas hookups or something. That was the line that the court was drawing. So I'm not clear what else you think needs to happen. Well I think that what the proof here showed was that it was in fact, as you mentioned your honor, a property that was rented for various purposes. Residential units up top, a vacant commercial space below. But that only goes to the question of what was the property. Do me a favor. Pull your little microphone closer to your mouth. Of course, your honor. Is that better, your honor? I don't know. Talk and I'll find out. So I think that the proof that this was, you know, used for residential apartment renting upstairs and a vacant commercial space downstairs went to the function of the property, which is the first prong that the Supreme Court used. What other evidence do you think Russell calls for? Russell says Congress means to use its full Commerce Clause power. And so we know it can simply affect interstate commerce. And we know from, you know, I'm thinking actually in the antitrust area, in cases like Summit Health against Pennis or so on, that, you know, even if you're one little ophthalmologist in Los Angeles, you know, you affect interstate commerce. So I can't see why there's anything but, you know, an insubstantial argument that this, that being in the business of renting property, whether for residents or for commercial activities, doesn't satisfy this. Well, I don't think that Russell was purporting to set forth anything about the sufficiency of the evidence in that case or a question of whether or not individualized proof was required. What Russell was addressing was a statutory argument that originally originated from this court, which was a question of a lack of jurisdiction, an attempt to dismiss the indictment for lack of jurisdiction, that the offense was not within the scope of the statute. So it was a question of statutory interpretation, and there were the statements, as you mentioned, about congressional power to enact the statute. Which is very broad, and we have held that any commercial building actively used for a commercial business does meet the interstate commerce element. And there are the holdings of this court that do say that, but as I set forth in the brief, I think that those decisions should be read narrowly, or potentially narrowed under Circuit Rule 40E, because they're in conflict with other decisions of this court which interpret interstate commerce elements of other federal criminal offenses, such as United States v. Peterson, United States v. Groves, where there was an interstate commerce element, the government did try to resort to an interstate commerce element because the Supreme Court has said drug dealings in interstate commerce. Well, those are different statutes. I'm going to redirect you and ask you to talk about Agent Rashke's testimony. He's been before us, personally, in more than one case. And he does, in this instance, qualify what he's saying. He's saying, you know, I can tell you about which tower this phone is able to make outside the apartment, or down on the street, or whatever. So, why isn't that something that just goes to the weight of the evidence and not its admissibility? Because I gather you're arguing that it should have been kept out altogether under Rule 702. That's right, Your Honor. And I think that this court should use that decision de novo, because the District Court merely looked at prior judicial acceptance of testimony like Agent Rashke's. But when you look at what Agent Rashke was testifying to, we're not challenging here the testimony that the cell phone connected to Tower X at a given time. That is testimony that has been accepted. That's not challenged. The question is, what does that mean? What does it mean? What can you take from the fact that the cell phone tower connected? And Agent Rashke doesn't have the qualifications, his methodology for extrapolating from that isn't reliable, because he doesn't... Does he ever actually say, though, that because when I'm standing in this room, Tower 785 or whatever, he doesn't say that last thing. And so, is that enough to qualify it in a way that we can have confidence? And I guess the second question I have is, when you have the evidence that he leaves the car, that Navarette drops him off, he comes back to the car two hours later with the two full garbage bags, you see this stuff in the garbage bags came from Adame's residence, or they find it in the residence and see that it was the stuff from Ortiz's apartment. Why isn't this cell tower analysis cumulative? And so even if it was a mistake to admit it harmless? Well, I think that the way it was used was to place Mr. Adame in the apartment. Right, and I'm saying that the garbage bag evidence also places Mr. Adame in the apartment. I think that's certainly a permissible inference for purposes of an analysis that the jury could have undertaken, but I think that the testimony is stronger in that it has the imprimatur of an expert. It is the only testimony that sort of directly says he was there in the building. It does require a few more inferences. Staying with the garbage bags for a minute, you know, if Navarette drops him off, he comes back with these garbage bags, and then we have testimony that the stuff inside the garbage bags came from Ortiz's apartment. I don't see how he gets it without going, you know, part of the government's theory of the case anyway, was that places him in the apartment. We have the motive, we have the fact that it burned, we have the accelerants, and we get him into the apartment with the garbage bags. And if that's true, then do we need to worry about Rashke here? I think there's an additional element, which is beyond presence, it's a timing element, right? The garbage bags don't convey any element of when, allegedly, Mr. Adame was in this apartment. Well, the two-hour window, don't you think? That, perhaps, is permissible, would be a permissible inference from the evidence, but the testimony... I think it's really more than permissible. It's almost overwhelming. I mean, given the scenarios that happened that night. I mean, the thing is, even if this testimony, I don't think the cell phone testimony went too far, but at any rate, the evidence was overwhelming here. I understand it was circumstantial, but lots of evidence that the jury could find to support this. Yes, Your Honor, absolutely, Your Honor, and I think that even then, if you took the position that you can use that evidence to place Mr. Adame in the apartment, that you still would be lacking the crucial evidence of the connection to the gasoline in this case, and I think that that's where all of the evidence that the government summoned would go towards location, but I think the Tenth Circuit's case in Yoakum is on point, which is, you know, presence isn't just enough in an arson case without something else. But he told the girlfriend to drive to the gas station, even though the car didn't need gas. Then he told her to go ahead and pay, and just get $10 worth, and when she gets back, she sees the number of the pump go up, but she doesn't see gas going into the fuel tank. And on his hands in January, by cleaning the windshield? I mean, who does that? Well, I think there was... Somebody wants to maybe get gas off their hands, I would think. Well, I think there was also testimony from Ms. Navarette herself that he was cleaning the windows because they had gone fogged up. With his bare hands? Well, I think that he probably wouldn't have wanted to get his gloves wet in that circumstance if he was washing the windshield, but I think that the key point is that those activities, the idea of just going to a gas station, asking someone to go in and put the cash in, those aren't the kinds of facts that would carry the weight of the entire inference that not only did he go to a gas station, but he took the gas, he put it unseen, into an unseen container, without getting any trace of it on him, without any smell of it, and that's enough to put all on just the simple fact of going to a gas station, which is something obviously that millions of Americans do every day, every week. I think it's too much for that one fact to bear. If there was other incremental evidence, perhaps, but I think that's a crucial element here, and I think that the evidence... But there's at least opportunity to get the gas... I mean, obviously, the government's case is built up of, you know, a little fact here, built on the next little fact, on the next little fact, all circumstantial, as Judge Williams says, but why a jury can't draw the inference from all of that? And that's what your position has to be, that it's actually impermissible for a jury to draw the inference that he, in fact, did get the gas, and he was washing the gas off his hands, and he then, when Navarrete drops him off at the apartment, and he collects his stuff, he takes the backpack and he dribbles gas in there. You don't probably need that much, actually, for what he did. Well, I think that just... I think that those are a lot of inferences to put just on the fact of being at a gas station. I think, on its own, that's not enough. I think that's what this Court would sort of regard as perhaps a suspicion or a speculative inference, but this Court has held that speculative inferences, suspicions, aren't enough. I think you have cases, the Pieskowski case, the Jones case, where you also have a circumstance where you say someone was in a place where they could have done something, been involved in criminal activity, but that alone is not going to be enough. We're not going to just go on the suspicion of the possibility or the speculative inference, you know. In Pieskowski, it was the presence right before a murder. In Jones, it was cooking crack cocaine, I believe, and... No, I mean, that's a perfectly sound proposition of law. Whether it applies to this set of is a different question. Well, I would certainly posit that it does, and I think the other piece of prejudicial evidence that I'd like to address to this Court is this purported incriminating statement that Mr. Adame makes, allegedly, to Officer Garcia. I didn't mean to hurt Jimmy. I didn't mean to hurt Jimmy's statement, right? And that's a statement that the government referred to multiple times in its closing argument, said these are the words of a man who's guilty, who has something very, very serious to hide. So it was obviously something that the government referred to multiple times. I think it's helpful to its case, and I think, as a result, could be very prejudicial. Now, prior to that statement... Right, and in that statement, there was no motion to suppress, right? That's right, Your Honor, but this Court has recognized that even where no motion to suppress was filed before the District Court, this Court may consider a suppression argument where, had a motion been presented to the District Court, it would have been an abuse of discretion for the Court to deny it. And I would posit that that's the case here, because... The gentleman argues that when he says, I don't want to talk about this anymore, that it's an ambiguous statement. Well, I would respond that this Court, in Davis v. Greer, specifically said the statement, I don't want to talk about it anymore, is an invocation of the right to silence, and I don't think that this statement is fundamentally different from that. And I'll reserve the rest of my time. Thank you. Okay. Ms. Nesser. May it please the Court. With regard to the sufficiency of the evidence, there was ample evidence that supported the jury's verdict. A properly instructed jury heard the evidence and arguments about all the defects, and decided that the defendant was guilty. Your Honors ticked off some of the evidence better than I could, but the relationship with Ortiz... Can I stop you there, because I was very unhappy with this video that went back to the jury's room. It seemed to me utterly beside the point that there was no reason the government would have wanted them to hear Ortiz saying she looked like she's on fire, if it wasn't trying through the back door to get the idea of fire in there. There was plenty of evidence that he was guilty, whether on a 403 basis or even just on a flat-out relevance basis. I was... I mean, this just isn't good. Your Honor, with regard to the Exhibit 26, the government did file a motion in limine on that, and there was no objection. There was no objection before or during trial to admission of that exhibit. The jury had already seen it, hadn't they? It had already seen it by the time it went back to the jury, and there were no objections to the defendant's obsessive... his motive and his obsessive relationship with the victim. Even if the judge's 403 analysis had been insufficient, any error was harmless, as Your Honor points out, because the jury had already viewed the video in open court, and it was pure speculation that the jury would view the video repeatedly to the exclusion of other evidence, if at all. So, I mean, so your argument has to be that whatever damage was done by this video was already done without objection, and whatever marginal extra damage is done by sending it back to the jury, and again, I'm just anticipating what you're probably saying, wasn't enough to spoil the whole trial. Your Honor, well, the video was probative of the defendant's state of mind and of his relationship with Ms. Ortiz. The video was taken... I mean, so there's just a fundamental difference. I mean, her question was, and you should have actually said yes, the evidence was overwhelming, so even if there was an error, this video, letting it go back to the jury, didn't have any impact. But, you know, the fact of the matter is you had several videos that showed his obsession, so why did you even need the video that said fire in the first instance? I understand it wasn't objected to. Correct, Your Honor, and we do agree that it was harmless in light of all the other evidence. And so you're you're throwing the fire in. It's just inviting error. It just seems so needless when you have this other evidence and commenting she looks like she's on fire, and she's, oh, it's a fire case, maybe he was trying to burn her up, too. You know, it just leads to this speculative chain that's completely unnecessary. Well, as Your Honors have pointed out, in an arson case, there, it's usually reliant on the defendant's motive in this case. Yeah, but you don't understand. The thing is, to say that you look like you're on fire, and this video took place, like, not the day of something, it was like way before, right? It was about two weeks beforehand. Right, and it doesn't, and you can't really show any real connection between that video and the fire. It's just like, it's like excess. It's like, why did the government even need to introduce it? You know, because the case would be cleaner. You already had all these other videos shown. I mean, that's the point. Right. And why invite error? I mean, you know, it just seems to me. Yeah, I mean, it's just like extras at work. Why do this when that's gonna be the thing that'll probably be the most controversial, should you get a conviction? Right, which is, I believe, why the government decided to file a motion in Lemonade to see this issue up before trial, and there was no objection. There was no four or three objection at all. It came in clean, with no objection at all. Yeah, I mean, you can't count on that, but anyway, let me ask you about Agent Rashke, because we've had a number of these cell tower cases, and the risk here, I mean, the first thing I want to say is that even though he doesn't really tee up the Rule 702 Daubert objection the way he might ideally have done, it looks to me as though the trial judge does actually consider this objection during the trial. He says things like, in any event, I'm overruling your Daubert objection, and then he discusses the merits, and then at some point he says, you know, I understand your motion to strike based on Daubert, and if it has to go up, the Seventh Circuit will review it. So I think this is properly before us. That's point one. Point two is the risk the jury is going to attribute too much specificity to these cell things. There are all kinds of factors, and we have Agent Rashke here talking about some software program. We don't know what it is. We don't know how reliable it is. We don't know anything about this software that he uses when he's wandering around trying to see which tower a phone would connect to. And he's not using Mr. Adame's phone. If Mr. Adame has some old clunky four-year-old phone, it's probably not going to connect as well. I have a clunky four-year-old phone. Probably Judge Bauer has a clunky phone. I have a new phone, and my phone connects nicely to a lot of things. But the fact is, the particular phone is going to make a difference too to how well it picks up signals and which tower, and there's just so much about this that seems to me not really to meet the requirements of Daubert or 702. I prefer to think of it as 702 myself, since it codifies Daubert. But in any event, software we've never heard of, telling the jury, I'm standing here, my phone's doing the same thing his phone did, just strikes me, again, as overreach. Which I think is part of the reason why the fact that this argument was waived. It's not waived, though. I'm telling you, with the district judges saying, I'm ruling on the Daubert motion, you can bring your Daubert thing, I understand your motion to strike based on Daubert. Those are the district judge's words. That's not waivered. But the Daubert motion was raised for the first time in the middle of the cross-examination. But it doesn't matter. If the judge reaches it, then you had a chance to say what you needed to say, they had a chance to say. He does object after the direct and right before cross, and the judge comments, you're a little late. But then he goes on and addresses it on the merits. If he had said, you're a little late, I'm not going to think about it, then we're in abuse of discretion, manage your own trial territory, and largely we defer to the district judges on things like that. But that's not what he does. He entertains it on the merits. And he says he's overruling it on the merits. Correct. And I think that was based on a long line of cases, including this Court's most recent opinion, which found that historical self-analysis can show with sufficient reliability that a phone was in a general area, especially a well-populated one. Well, that's right. So general area. So if the question had been, was Mr. Adame in Rockford or was he in Chicago, this would have been great evidence because that level of specificity really can't be contested. Was he inside Ortiz's apartment or was he two blocks away at a convenience store? Not at all clear on this record that the cell tower could distinguish those two. Well, here I believe that Agent Rashke testified in a very reliable and cautious manner. What's his software program? Do we have any idea? He testified that the software program shows what signal. Does it like find my phone? I mean, what is it? I mean, there's software and there's software. If we don't have any idea, if somebody says, oh, I have some software, you know, that doesn't tell me a thing. Have you ever looked at the App Store on your iPhone? There's like a lot of software out there that you might have. Yeah, the software was not a subject of cross-examination here, and the software he testified was similar to what some standard phones, maybe not Judge Bowers, but some phones can show you which signal is the strongest. And he testified that he is not making a statement that a cell phone always connects to the strongest signal. He testified only, and he testified that this is not a GPS. He said he's not making any assumption it's connecting to the closest tower. He just said that using his software at those key addresses, the crime scene, the parking lot, the two houses at issue, that his software did connect to the same towers that the defendants in Ms. Navarette's phone connected to, and, therefore, it is consistent with the fact that their phones were located in the same area he used the software. With regard to the post-arrest statement, as your Honors know, the defendant's argument is based largely on information that is outside the record on appeal. The circumstances under which you should consider such information is limited, and the defense had an opportunity to file a motion to suppress in the district court, had the opportunity to cross-examine the testifying officer at trial about the statement, but it chose not to, and as a result, this court is operating on a very limited record without sufficient information about the statement. Do you think we can't even get to this comparison to what's said in Davis v. Greer, for example, I don't want to talk about it anymore because the statement, I don't want to talk about this anymore, isn't sufficiently, it's not in the record? That's correct, Your Honor, it's not in the record at all, and the identical situation was presented in the Acocks case, and also in the Daniels case, which is cited in the defendant's brief, and under similar facts, this court held that it would not reach the merits of hypothetical motion to suppress based on hypothetical testimony and material not in the district court. In the Daniels case, this court held that the defendants knew all they needed to know, they didn't file a motion to suppress, and because good cause did not excuse the lapse, that you could not consider their argument on appeal, and Your Honor should do the same in this case. I just have one question. I know that it was three hours into the interview that he said, I can't tell you why in response to a question, and so I don't want to talk about this anymore. How far in was that? Just remind me. Well, that statement is contained outside the record. If you'd like me to answer that based on the ATF reports that are not in the record. Okay, because I just wanted to clear, I didn't see it in the, okay, thank you. If there are no further questions, then the government asks this court to affirm the conviction of the defendant. All right, thank you very much. Anything further, Mr. Campbell? Yes, Your Honor. Just a few brief points. First, with respect to the testimony from Agent Rashke, while the government has talked about sort of Agent Rashke was being cautious, I just wanted to focus that despite the language in which his conclusions were couched, he actually purported to make very specific findings that aren't supported. So, for example, and I would point to, I think it's A144 in the record, is a place where Agent Rashke says, the cell phone testimony is consistent with Mr. Adame being in Ms. Ortiz's apartment, but it's inconsistent with him being at the parking spot that's three buildings down on the same apartment block. That's the kind of specificity that he's purporting to testify, despite the guise of I can't tell you what specific address it's at. When you look at what he's really testifying to, it's very granular in a way that I don't think either this court's precedents or the precedents of other courts would support. With respect to the preservation of the record issue, and to Judge Williams' question, the question about what time the invocation was is in the appendix,  I'll address in just one second, but that's at A250, I believe, is the site. It's a few hours in, is my understanding. And to the preservation of the record, I would just say that this court's standard for reviewing motions to suppress, based on what would a district court have done had it been presented with a motion, is only fully realized if you actually consider the full body of evidence that could have been presented to the district court in such a motion. But you need to make proffers, usually. There is a way to handle that kind of thing that was not followed here. I know it's not your fault, but it was not, in fact, followed here. That's right, Your Honor. But I think that to truly analyze what would a district court have done, you should look at a limited scope of evidence. I don't think that looking at the extra record evidence in this case would fully expand this to some kind of mini habeas proceeding or something where you're doing extra investigations. It's looking to my time is finished. Thank you, Your Honor. Thank you. And you are handling this case at the court's request. Yes, Your Honor. So we thank you very much for your assistance to the court and to your client. Thank you as well to the government. We'll take the case under advisement.